UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,                    Case Number 17-20839

v.                                            Honorable David M. Lawson

JONATHAN TRENT,

                    Defendant.

_____/

## ORDER DENYING MOTION FOR COMPASSIONATE RELEASE

Defendant Jonathan Trent has filed a motion asking the Court to resentence him to time served under the authority of the compassionate release provision of 18 U.S.C. 3582(c)(1)(A)(i), as amended by section 603(b)(1) of the First Step Act of 2018, Pub L. 115-391, 132 Stat. 5194, 5239, or alternatively, to recommend to the Bureau of Prisons (BOP) that he be transferred to home confinement under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, 18 U.S.C. 12003(b)(2).  Trent has not exhausted his remedies with the BOP, a necessary prerequisite for seeking compassionate release, and even if he had, he has not demonstrated any extraordinary circumstances justifying immediate release.  However, the Court also does not believe that a recommendation for early placement by the BOP to home confinement is appropriate.  The motion will be denied.

I.

The charges against Trent stem from a credit card fraud scheme, which was discovered in September 2017 when police apprehended him and others while driving to Detroit from Grand Rapids, Michigan.  Police found several gift cards and credit cards in their car and in Trent's wallet.  They also recovered a laptop and wireless credit card skimmer.  Trent admitted the skimmer belonged to him and that he used an application on his cell phone to produce counterfeit credit

cards.  A search of Trent's phone revealed numerous accounts on illegal "dump" sites in which individuals buy and sell stolen credit card accounts.  Trent and his friends used these dump sites to purchase well over 1,250 stolen credit card accounts from victims throughout the country.  Trent purchased that information and then encoded it onto fraudulent credit cards that he used.  Trent's phone also contained the names, addresses and other identifying information of the true account holders.

On March 2, 2017, Trent pleaded guilty under a plea agreement to Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §1349, Possession of Fifteen or More Counterfeit or Unauthorized Access Devices, in violation of 18 U.S.C. § 1029(a)(3), Possession of Device-Making Equipment, in violation of 18 U.S.C. § 1029(a)(4), and Aggravated Identity Theft in violation of 18 U.S.C. § 1028A(a)(1).  The Honorable Avern Cohn sentenced him to a below-guideline prison term of 42 months, which included a consecutive 24-month term under section 1028A(a)(1).  A two-year term of supervised release is to follow.

In April 2019, Trent filed a *pro se* motion requesting placement in an RRC facility for 12 months prior to his good time credit release.  The Court denied the motion because it had "been advised by Probation that there are no extenuating circumstances to warrant such a placement." (ECF No. 107, PageID.342).

Trent is 29 years old and of African American descent.  He currently is an inmate at FCI Morgantown, in West Virginia.  Public records from the Bureau of Prisons indicated that he is scheduled to be released on September 23, 2021.  He has served approximately half of his custodial sentence.  To date, there are no reported cases of COVID-19 at Morgantown.  Trent's medical records show that he has asthma, for which he was prescribed an inhaler.  BOP medical records also reveal that his asthma is "stable," "mild," and "intermittent," with "rare albuterol use."  During

a routine exam in 2019, Trent reported that his last use of his inhaler was about a year and a half ago.  However, in his motion Trent asserts that he has been "experiencing severe symptoms in the last couple of weeks but has not received the proper care and attention required to properly combat COVID-19."  He also says that he "has been put in quarantine with forty (40) other inmates who are also experiencing symptoms which can also exacerbate his current condition." (ECF No. 114, PageID.365).  He does not further elaborate on the precise nature of his "severe symptoms."  Finally, neither party provided any disciplinary records for Trent.

On May 17, 2020, Trent filed a motion seeking compassionate release.  He does not allege that he first filed a request for compassionate release with the warden at Morgantown.  However, the government has provided a letter dated May 1, 2020 in which Trent asked the warden for release due to his asthma diagnosis and "sickle cell."  (Trent's medical records show he denied carrying the sickle cell trait.  He does not argue sickle cell as a basis for his motion.).  The warden denied his request in a letter dated May 18, 2020 because he had not "provided the minimum criteria for review."  The warden also advised Trent of his right to "appeal this decision through Administrative Remedy procedures."  (ECF No. 120-3, PageID.404).  In any event, Trent contends that the exhaustion requirement should be waived, and he argues that release to home confinement is warranted due to the acute risk to his health posed by the novel coronavirus and his medical condition.

The government says that the BOP has taken steps to mitigate the spread of COVID-19 within the prison system, including releasing thousands of inmates at high risk.  And it argues that Trent's motion should be denied for failure to exhaust his administrative remedies, and that he does not have a serious medical condition or other risk factors that amount to extraordinary or

compelling reasons to grant compassionate release.  The government also insists that the defendant is a danger to the community based on his serious economic crime.

II.

As a general rule, "a federal court 'may not modify a term of imprisonment once it has been imposed.'"  *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020) (quoting 18 U.S.C. § 3582(c)).  "But that rule comes with a few exceptions, one of which permits compassionate release."  *Ibid.*  "The request may come through a motion in federal court filed by the Director of the Bureau of Prisons. 18 U.S.C. § 3582(c)(1)(A).  Or it may come through a motion filed by the inmate after he has 'fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the [prisoner]'s behalf' or after 'the lapse of 30 days from the receipt of such a request by the warden of the [prisoner]'s facility, whichever is earlier.'"  *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

Upon a proper motion via either avenue, the Court may, "[a]fter 'considering the factors set forth in section 3553(a) . . . reduce the prisoner's sentence if it finds that 'extraordinary and compelling reasons warrant such a reduction' or if the '[prisoner] is at least 70 years of age,' has 'served at least 30 years,' and meets certain other conditions."  *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)(i), (ii)).  However, prisoners may not seek judicial relief before they have sought release under this statute from the prison warden.  "Even though [the] exhaustion requirement does not implicate [the Court's] subject-matter jurisdiction, it remains a mandatory condition," and "[i]f the Director of the Bureau of Prisons does not move for compassionate release, a prisoner may take his claim to court only by moving for it on his own behalf.  To do that, he must fully exhaust all administrative rights to appeal with the prison or wait 30 days after his first request to the prison."  *Id.* at 833-34 (quotations omitted).

Despite the presentation and denial of a request to the warden, the record does not demonstrate exhaustion within the meaning of section 3582(c)(1)(A). In *United States v. Alam*, the Sixth Circuit held that "[i]f the Director of the Bureau of Prisons does not move for compassionate release, a prisoner may take his claim to court . . . by moving for it on his own behalf," but "[t]o do that, he must 'fully exhaust[] all administrative rights to appeal' with the prison or wait 30 days after his first request to the prison." 960 F.3d at 833-34 (quoting 18 U.S.C. § 3582(c)(1)(A)). The court of appeals further held that the exhaustion requirement is a claim processing rule that does not implicate subject matter jurisdiction, but that it also is mandatory and not subject to waiver, forfeiture, or any pertinent equitable exception, at least where the government timely asserts an objection based on failure to exhaust.

Here, the defendant submitted a request for compassionate release to the prison warden on May 1, 2020 and waited only until May 17 to file his motion for release with this Court — less than the 30 days the statute requires. It is true that the Warden issued a denial on May 18, but if an inmate relies on that mode of exhaustion, "he must 'fully exhaust[ ] all administrative rights to appeal.'" *Alam*, 960 F.3d at 833 (6th Cir. 2020) (quoting 18 U.S.C. § 3582(c)(1)(A)).

The FSA allows two paths to judicial review of compassionate release rulings by BOP authorities, and both begin with the submission of a request to the warden. The inmate may seek judicial review if the warden denies his request and the defendant then exhausts his administrative appeals, *see* 28 CFR § 571.63; 28 CFR § 542.15, or 30 days elapses "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A)(i). But the defendant may not proceed to Court directly without first either completing the administrative appeal process or waiting at least 30 days *after* tendering his request for release. The defendant has done neither.

Even if the Court could entertain the request for compassionate release, Trent has not made a convincing case that he is at an elevated risk from COVID-19.  His request for release  under section 3582(c)(1)(A)(i) must be premised on "extraordinary and compelling reasons."   There are no clear guidelines for establishing those grounds, but courts have applied this standard in the wake of the pandemic with the CDC guidelines in mind, accounting for both individual and institutional risk factors.  In *United States v. Salic*, No. 08-cr-287, 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020), for instance, the defendant had hypertension for which he was prescribed Lisinopril and baby aspirin.  He was also housed at a facility where COVID-19 cases were reported.   The defendant had only five more months to serve before being eligible for home confinement and had received permission from his unit manager to transfer to a halfway house.  The defendant's application for reentry was in process at the time of the court's decision.  The district court considered all of these factors in determining that early release was warranted.

In *United States v. Rodriguez*, No. 03-cr-00271, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020), the defendant was in year 17 of a 20-year sentence.  He had significant health issues including Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension, obesity, and liver abnormalities.  He was housed at a facility with confirmed cases of COVID-19.  He had a good prison record and showed improvement in prison.  Notably, the district court determined that none of those factors (length of sentence, health condition, and prison record) alone were sufficient to warrant release.  However, when taken together, they persuaded the court that release was warranted.

In United *States v. Coker*, No. 14-085, 2020 WL 1877800 (E.D. Tenn. Apr. 15, 2020), the defendant was wheelchair-bound with severe terminal chronic obstructive pulmonary disease that required oxygen therapy, which the BOP admittedly could not provide.  The district court therefore

found that the request for relief demonstrated a serious enough condition to warrant release even in the absence of heightened risk from COVID-19.

And in *United States v. Saad*, No. 16-20197, 2020 WL 2065476 (E.D. Mich. Apr. 29, 2020), the defendant had served 33 months of a 72-month sentence for a non-violent drug offense. He was 71 years old and housed at FCI Milan, which has several confirmed cases of COVID-19. He also suffered from a host of medical conditions, including kidney disease, hypertension, pulmonary hypertension, sleep apnea, shingles, diabetes, back problems, and a frozen thigh from an overdose of coumadin given by prison officials. He also had heart surgery and knee replacement surgery. He had also recently been diagnosed with recurrent bladder cancer. The district court concluded that this combination of serious medical conditions plus the time he had served on a non-violent offense justified reducing his sentence and release to home confinement.

The common features of the few recent cases where inmates have been granted judicial relief on motions for compassionate release due to the pandemic included properly exhausted claims that unreasonably were refused despite the existence of severe, chronic, or terminal conditions that might warrant release even in the absence of a pandemic.

It is beyond debate that the fear from the pandemic is very real, even though no cases of COVID-19 have been reported at Morgantown. Nonetheless, Trent is not among the prison population at elevated risk of complications from the disease. At age 29, he is not within the category of persons recognized by the CDC as facing elevated risks from the coronavirus due to age. Trent asserts that he has asthma, and the medical records available reflect some intermittent treatment for asthma symptoms. According to readily available online sources, "[a]asthma is classified into four categories based on how often you have symptoms and how well you breathe. These categories are mild intermittent; mild persistent; moderate persistent; and severe persistent."

Adult Onset Asthma WebMD Medical Reference, https://www.webmd.com/asthma/qa/what-are-the-categories-of-asthma. "Moderate persistent asthma" is characterized by the following symptoms: "You have symptoms daily. You have nighttime symptoms more than five times per month. Your symptoms affect your activity, happen more than two times per week, and may last for days. Lung function tests are 60% to 80% of predicted values based on your age, sex, and height." *Ibid*. "Severe persistent asthma" is defined as follows: "You have symptoms continuously, with frequent nighttime asthma. Your activities are limited. Lung function is less than 60% of predicted values based on your age, sex, and height." *Ibid*. None of the records submitted reflect any diagnosis of significantly reduced lung function, and the more recent records indicate that Trent had not used an inhaler for over a year and a half. Nothing in the available records sufficiently substantiates a conclusion that Trent's condition presently is serious enough to place him in any category of elevated vulnerability to the coronavirus disease.

Moreover, current CDC guidelines indicate that of people with asthma, only those "with moderate to severe asthma may be at a higher risk" of severe illness from COVID-19. CDC, People with Moderate to Severe Asthma. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited July 14, 2020). There are also recent reports that asthma may not impact a person's susceptibility to COVID-19 as was initially believed. *See* Danny Harkin, Asthma is Absent Among Top Covid-19 Risk Factors, Early Data Shows, The New York Times (Apr. 20, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited July 14, 2020). Finally, judges in this district, including the undersigned, have denied compassionate relief where an inmate's only identified health condition was mild asthma and no other risk factors were present. *See United States v. Collins*, 17-20360 (E.D. Mich. May 7, 2020 (27-year-old inmate with mild asthma who had not used an inhaler in

over a year); *United States v. Sample*, 11-20368 (E.D. Mich. May 26, 2020) (42-year-old inmate with mild asthma who had not used an inhaler in the past six months).

None of this is to minimize the seriousness of the coronavirus pandemic or the alarming rapidity of its spread within federal prisons. But the pandemic is a global phenomenon and some risk is inherent no matter where Trent resides, either at home or in prison. He asserts that his risk would be lower at home, but he has not put forth any convincing evidence to demonstrate that he is at an especially elevated risk of harm in the present situation of confinement. And Michigan itself has a staggering number of confirmed COVID-19 cases. Trent has not demonstrated "extraordinary and compelling reasons" to reduce his sentence to time served.

### III.

Trent also requests that the Court recommend that the BOP place him in home confinement under the CARES Act, 18 U.S.C. § 12003(b)(2). A defendant's request for home confinement under the CARES Act is different than a request for compassionate release under 18 U.S.C. § 3582(c)(1)(A). *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281 (2020); *United States of America, v. Benjamin Gordon*, No. CR416-082, 2020 WL 3964041, at *1 (S.D. Ga. July 13, 2020). Section 12001(b)(2) is directed at the Attorney General. If he finds that emergency conditions will materially affect the functioning of the BOP, the Director of the BOP may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of 18 U.S.C. § 3624(c)(2). Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281 (2020). And the Attorney General has done just that: in a memorandum issued on April 3, 2020, the Attorney General utilized his authority under the CARES Act to direct the BOP to "immediately maximize appropriate transfers to home confinement of all appropriate

inmates held at FCI Oakdale, FCI Danbury, FCI Elkton, and at other similarly situated BOP facilities where COVID-19 is materially affecting operations." *See* Memorandum from the Attorney General to the Director of the Bureau of Prisons (Apr. 3, 2020), available at https://www.justice.gov/file/1266661/download.

But under section 12001(b)(2), "[d]esignation of an inmate's place of confinement, including placement in home confinement, rests within the absolute discretion of the BOP." *United States v. McCloskey*, No. 18-CR-260, 2020 WL 3078332, at *2 (S.D. Ga. June 9, 2020); *see also United States v. Calderon*, No. 1911445, 2020 WL 883084, at *1 (11th Cir. Feb. 24, 2020) (explaining that under 34 U.S.C. § 60541(g)(1)(A), the Attorney General "may" release eligible elderly offenders, and the district court was without jurisdiction to grant relief). Therefore, the district court has no authority to grant relief under section 12003(b)(2).

However, the defendant's request might be invoking a similar provision of the Second Chance Act. "The Second Chance Act of 2007 . . . increases a federal prisoner's eligibility for pre-release placement in a halfway house from 6 to 12 months, and requires the Bureau of Prisons (BOP) to make an individual determination that ensures that the placement is 'of sufficient duration to provide the greatest likelihood of successful reintegration into the community.'" *Vasquez v. Strada*, 684 F.3d 431, 432-33 (3d Cir. 2012) (quoting 18 U.S.C. § 3624(c)(6)(C)). "In accordance with the Act, regulations were issued so that placement in a community correctional facility by the BOP is conducted in a manner consistent with 18 U.S.C. § 3621(b)." *Ibid.* (citing 28 C.F.R. § 570.22). That statute, in turn, states that any recommendation by the sentencing court that a convicted person serve a term of imprisonment in a community corrections facility "shall have no binding effect on the authority of the Bureau . . . to determine or change the place of imprisonment of that person." 18 U.S.C. § 3621(b). Relevant factors that the BOP shall consider

include "(1) the resources of the facility contemplated; (2) the nature and circumstances of the offense; (3) the history and characteristics of the prisoner; (4) any statement by the court that imposed the sentence; and (5) any pertinent policy statement issued by the Sentencing Commission." *Lovett v. Hogsten*, No. 09-5605, 2009 WL 5851205, at *1 (6th Cir. Dec. 29, 2009) (citing 18 U.S.C. § 3621(b)).

The parties have not submitted Trent's prison record to the Court, and Judge Cohn previously denied a similar request for early halfway-house placement due to the absence of extenuating circumstances. The Court believes that the BOP is in a better position than the Court to assess the propriety of the defendant's placement for reentry at an appropriate time, based on the applicable statutory factors and all of the information then available.

IV.

Trent has not exhausted his administrative remedies, and he has not demonstrated that compassionate release under 18 U.S.C. 3582(c)(1)(A)(i) is justified.

Accordingly, it is **ORDERED** that the defendant's motion for compassionate release (ECF No. 114) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  July 15, 2020